Dakota, et al. And I understand that for the appellant we have Attorney Jenny, is that right? Yes, Your Honor. And you would like to reserve two minutes for rebuttal, is that right? Yes, please. Good. So I just ask you all to keep an eye on the little yellow and red lights. We'll try to hold as best as we can to the calendar today. And if need be, of course, if we have additional questions, we might keep you up longer. But barring that, we're going to try to hold to the times. So, Mr. Jenny. Thank you, Your Honor. May it please the Court. Ryan Jenny for Plaintiff Appellant. I'll focus on the key issue, which is injury in fact. The Court shall reverse for three main reasons. First, the trial court applied a plausibility pleading standard. That was error because the plausibility standard doesn't apply to the standing inquiry as this Court held in Ross v. Bank of America. Rather, the standard is colorable or possible. Second, the trial court failed to credit plaintiff's information and belief allegations, which under Arista Records v. Doe 3, must be accepted as true where the facts are solely in the possession of the defendant, as they are here. Third, the trial court failed to make all reasonable inferences in plaintiff's favor. Indeed, the district court drew inferences against plaintiff, most importantly, by reading allegations of Thranko's collapse in value as meaningless because he didn't concede the precise accuracy of stock valuations. Let's start with your first point. Has the case you cited distinguished colorable from colorable? Your Honor, the language in Ross refers back to Worth v. Selden, which was generalized allegations of standing are sufficient. The word colorable was used more recently in Harry v. Total Gas in 2018. There have been recent Southern District of New York cases. Last year, Toretto v. Donnelly was one that, examining the case law, used the word possible. I appreciate they used the word colorable. What I'm trying to understand is, did the court say anything to indicate they thought that was an easier or lesser standard than plausible? Yes, Your Honor. It's said that the court said that generalized allegations are sufficient. Specific factual allegations are not required. But did they say generalized is okay and you don't need the tougher standard if it is tougher? Right. Or did they just say generalized is enough? Yes, Your Honor. They distinguished Twombly and said that the Twombly plausibility standard explicitly didn't apply. Does not apply. It does not apply. So can I ask you, there seems to be two competing strands in our case law, if we accept your view of Roths. And I see the line. It says, plausibility is not at issue at this point as we are considering only Article III standing. So I see that and I can see the argument you make. And that seems to be carried forward, I don't know, through Rothstein, but certainly into Harry v. Total Gas. I can see that argument. However, we have another string of cases, and I'm seeing Amedax and Cortland Street and most recently Calcano, where we have said that the plaintiff must allege facts that affirmatively and plausibly suggest that it has standing to sue. And then those cases have relied quite explicitly on the failure of the plaintiff to establish standing. In some cases, injury in fact. Plausibly, would you agree with me that there are, I guess, these two competing and inconsistent lines of case law in our court? I don't believe so, Your Honor. The district court did cite John v. Whole Foods for plausibility. And in that case, the court did not attempt to overturn Ross. And it only used the word plausibility, really, in passing without any analysis. What do you make of the three cases I mentioned? And maybe you haven't read them. I don't know. I don't want to be putting you on the spot. But as I read them, they all use that same language. The plaintiff bears the burden of alleging facts affirmatively and plausibly suggest that a plaintiff has standing to sue. And then they talk about plausibility. And then in some cases, they hold that the plaintiff did not meet the standard of plausibility. So I understand that you could make an argument, well, Ross spoke to this argument. It predates these other cases. And therefore, if there are two competing strands, you go with the earlier one because one panel can't overrule another. But I guess I'm wondering, what is your view that somehow all of these cases are reconcilable? And if so, can you talk to these later cases and explain why their discussion of plausibility is reconcilable? Or perhaps you're not prepared to talk about it now. I don't know. Your Honor, I think it goes back to Worth v. Selden that the generalized allegations are sufficient. No, no, no. I'm talking about the later case law. I understand we have ancient cases from the Supreme Court that speak in these wonderful ways. But the question is, how have we as unambiguously requiring standing allegations to be pled plausibly? Right. The question is whether in your view that I'm misreading those cases, that's not what these later cases like Calcano said? Or is it that, yeah, they may have said that, but they just missed that we had already held in Ross. To the contrary. Your Honor, I'm not prepared to discuss the cases that weren't cited in the briefs. All right. Even if it's somewhat lower than plausible, you want to tell us how you meet the somewhat lower standard? Yes, Your Honor. Thank you. When an ESOP plan pays more than fair market value, the plan participant is injured. We allege that the plan paid more than fair market value in the complaint. These general allegations are sufficient under Worth v. Selden. Well, is it enough to say they paid too much? It is enough. That does it? Yes, Your Honor. Isn't that something anybody could say about anything? It's that you paid too much? That is enough because a generalized allegation is sufficient, but the fact is we Don't you have to, even if it's not, perhaps, whatever that margin is that gets you from general to plausible, don't you have to give the district court something to support your claim that it's too much? Either we've got an expert opinion or we capitalize income. Something that shows why you are prepared to prove they paid too much. Well, you certainly need to give enough to make it colorable. And what did you give? We gave quite a bit. First, we allege that the stock collapsed. I'm sorry. I couldn't hear quite what that word was. That Franco stock collapsed.  Collapsed. Collapsed. And plaintiff didn't disavow the stock drop in his pleading or in his brief below. The trial court got that wrong. In our complaint, we allege the value collapsed, citing to specific documents. We disavowed the precise accuracy of the valuations, but not the general collapse in value. The court was required to draw all inferences in plaintiff's favor, but it drew improper inferences in defendant's favor on this. The district court discounted the collapse entirely. In our brief below, opposing 12B6 and not 12B1 motions, we argued we weren't relying on the stock value collapse for our prima facie case because fair market value goes to an affirmative defense. We said post-transaction valuations may be relevant to defenses, but we didn't need to rely on them to disprove an affirmative defense and know that the collapse raised issues of fact on stock value. Article III injuries simply wasn't at issue on the brief. When you say in the complaint, as you say, taking paragraph 64 as an example, the shares were revalued at $13 million in April of 2015. That's your allegation? Yes, Your Honor. That's what was reported in the form 5500s that were filed. Who did the reevaluation? There was another trustee at that time. Actually, in that year, in 2014, Banker's Trust was still there. This is 2015? Excuse me, 2015, yes. Are you saying Banker's Trust reevaluated them? Yes. Is there a document where they did that? It's reported in the form 5500s. Who prepared the form 5500? The plan administrator does that. The plan administrator in this case was Taranko, and the form 5500 was signed by Defendant Merchandani under penalty of perjury. Is that form in the record? The form is referenced in the complaint, and it's a public record that's available on the Internet. It might have been helpful to have it actually in the record, but in any event. So somebody filed a form that says the chairs were reevaluated. Does the signer of the form do the reevaluation, or is the signer just reporting that somebody else did the reevaluation? The signer doesn't do the reevaluation. Who does? That's what I'm trying to get at. Who does? The plan trustee does that. Do we know that in this record? Yes, Your Honor. Do we have a document from the plan trustee that says, in my opinion, they're worth $13 million? The form 5500 reports that that's how it's done, and that's always how it's done in this kind of case. The 5500 reports that the trustee thinks they're worth $5,500. Correct, Your Honor. Your Honor, under ERISA, there must be an annual evaluation of employee stock ownership plans. I get that. I'm trying to understand, who does it? It's the trustee, with the help of evaluator that the trustee chooses. With the help of evaluators? Correct. Does that appear somewhere, that there are some professionals who express an expert opinion that backs up this 5500 form? Your Honor, that's reported in the financial statements that's attached to the form 5500, and that's also publicly available on the Department of Labor's website. Okay. And so you're pointing, you say in your complaint that you don't vouch for the precise amount, but you assert that they sort of show a trend, or you called it a collapse. Correct, Your Honor. There's no dispute. THRANCO has said that its stock value collapsed after the ESOP transaction. As for the exact value, we also alleged in the complaint that THRANCO has pumped millions of dollars into the company after the ESOP transaction. Specifically in 2015, over $3 million was pumped into the plan, and then there are 40 annual payments, which means that each year, more than $2 million goes into the plan. So a lot was going on after the ESOP transaction, and we can't rely on the precise dollar figures, but it is circumstantial evidence, we believe, that at the time of the ESOP transaction in April of 2015, the plan paid too much. Then it went back up to $30 million two years later. That's what's reported, yes. So is that enough to show overpayment or just market volatility? We believe overpayment, particularly since the most recent Form 5500 shows that the plan stock was less than half a million dollars. By this time, the company had pumped over $10 million into the plan. Can you help me understand something? So with each successive year, there's the shares that are sitting in the plan and the value that they collectively have. But then there's money getting pumped in, and there's debt getting paid down, etc., etc. To what extent, with each successive year, do the numbers reported as the value of the plan reflect the changes in the underlying stock values versus these other transactions impacting the overall assets of the plan? We just don't know. This is non-public information. It's a privately held company. They report, THRANCO reports, the number of the valuation, but not the details. Is it fair to say that given that company money keeps going into the plan, that anything that reported, you can see a scenario where the actual value of the shares would be even lower than you might infer from these reports. Is there a scenario in which they would be higher, that they would be more valuable? It would really depend on the information, the financial statements going into, you know, to the valuator and the trustee. But the Seventh Circuit in Great Bank versus, in Allen versus Great Bank, you know, did credit this kind of stock collapse as sufficient for the case to survive, a motion to dismiss. Can I just ask you, I'm trying to understand the extent to which the plaintiffs walked back the significance of these allegations in the complaint. And the district court quoted some things. For example, this is your opposition on page 13. The plaintiff does not allege an initial post-transaction drop in valuation flowing from the leverage nature of the plan's stock purchase. Is evidence the plan paid more than fair market value? So that seems to be a very square argument that a drop in price is not evidence. You're not alleging that that is evidence. The plan paid more than fair market value. And that strikes me, I think, as sounding different from the argument I think you're making now is, look, I don't know exactly how much it dropped. You know, these are rough estimates of how much it dropped. You know, don't quote us that that valuation is proper to the penny. But that's not what you said to the district court. You're saying it does not allege that it is evidence that the plan paid more than fair market value. That seems like a pretty broad concession. And I'm just wondering how we can fault the district court for, you know, taking you at your word. Or was there something else you said other than what she quoted there that you could point us to in your opposition where you didn't walk it back as far? Sure. Well, that sentence is taken out of context. And the context was that this was not a Rule 12b-1 motion. It was a Rule 12b-6 motion. We were not discussing injury in fact. That wasn't at issue. The first time that we have briefed injury in fact is before this court. What we were discussing in that brief was whether we needed to plead around an affirmative defense. So, you know, of course we were not using, we were not making the argument that we needed to plead around the adequate consideration affirmative defense because that was not our burden at that time. And also with regard to that specific sentence, we were referring to the initial stock drop which occurred three days after the ESOP transaction. We weren't, you know, relying on that because we had much stronger allegations because of the subsequent stock drops. You know, as the court, you know, recognized there's often a drop in stock price because of the leveraged nature of the transaction. But in this case, there's no way to explain all of the subsequent drops in stock value by blaming that on the leveraged nature of the transaction. Am I right in understanding your argument and your distinction from Lee in saying, okay, let's assume the initial stock drop reflects nothing more than the leveraged nature of the transaction. The impact of the leveraged nature of this is fully reflected in that initial drop and is not something that has echo or rebound impact in subsequent years. Any drops after that reflect drops in the value of the shares themselves? That's correct, Your Honor. Subsequent drops would have another cause than the loan. And I should note that we also stated in that brief that stock drops may not, you know, were not relevant to our claims for relief, which, you know, are the elements, you know, primarily under ERISA section 406, the prohibited transaction elements. But we did say that they may be relevant to the affirmative defense. So, you know, we were not, we didn't come out and say, you know, these facts are totally irrelevant. We said they may be relevant down the road when we have to talk about affirmative defenses. But we don't have to do that today. And they're not your pleading burden. They're the other guy's. They're not your pleading burden. They're the other guy's. That's essentially what you were saying. Correct, Your Honor. We don't have to plead around affirmative defenses. The shares were pledged as collateral? Yes, Your Honor. A purchaser would take the stocks, the shares encumbered by the loan? Your Honor, some shares were immediately allocated or within three days allocated to participants. But the ones that were not allocated to participants were collateral. And that's why you say the stock dropped? Well, we're saying the stock dropped because the price of the shares is revalued every year. So that's just what was reported. Well, if in those three days the collateralization of the loan occurred, that would account for a big drop in stock, right? Yes. And wouldn't show that the initial purchase price was too much? We didn't rely, as we said, on that initial drop primarily. That's how we were distinguishing our case from Lee v. Argent. Lee v. Argent, they relied solely on that initial stock drop. We just didn't. Okay. All right, we've kept you up far beyond the red lights. Thank you very much. You have reserved two minutes. One of them here. Let's see. I have two minutes here for the Appellate, so I'm a little confused. Are you looking to divide time? We are, Your Honor. It's Lars Golombek, Counsel for Appellate, Bankers Trust of South Dakota. And how would you propose to divide your ten minutes? We are dividing it five minutes and five minutes. It seems equitable. I'm glad you were able to sort that out. That's fine. Your Honors, may it please the Court, Lars Golombek on behalf of Appellate, Bankers Trust of South Dakota. The issue here about Article III standing, whether there's an injury in fact, the inquiry must begin and end with the complaint itself. What is actually spelled out in the complaint? What we have in the complaint are allegations of what are really a routine employer stock transaction involving a plan who acquired or bought shares of employer stock with Tharenko. The only other substantive allegation is that post-transaction, the value of the stock dropped. And as the district court noted, that is not, that is a non-event in a debt finance transaction. Similar to a homeowner acquiring a home through a mortgage, the ESOP here borrowed the funds to purchase the shares of stock. So when we talk about these form 5500 reported values, that reflects the equity value of the shares held by the plan. Not the value of the enterprise, Tharenko as a whole, it's what is the value that I hold as the plan of those shares of stock. So I understand that argument as it relates to the, I think this is the discussion we were having with your counterpart, as it relates to the initial drop, that there's an explanation that has nothing to do with having paid too little or too much, excuse me, for the shares. I think I understand the argument to be that over the ensuing years, we saw a total collapse of the stock or a much more dramatic collapse that can't be accounted for by the leverage nature of the transaction. Now it could be that some intervening factors caused that to happen, and I assume we'd hear about that from the defense. But as a matter of pleading, isn't that enough to create an inference that supports the allegation that it was overvalued to begin with? No, it does not. The borrow here is the plan. The plan has to pay off that debt over time. So we're year three of a 40-year note that has to be paid off. So my equity value is the value of my shares of stock. That takes into account the fact that I still owe money to be paid back. There can be other factors influencing the equity value, but the debt remains. You're only on year three, year four of paying off a note, a 40-year note. It clearly has to reflect the debt that's incurred. But the debt's only going down. The debt's not going up, right? Correct. It goes down, but it goes down by an incredible amount. And there's other factors. There was a discussion, and it's in the complaint. The equity value actually jumped up from $13 million to $30 million, right? And then it dropped again. That reflects, just like any other shares of employer, the fortunes of an employer can go up and go down over subsequent years. But you're still factoring in the debt. The debt still remains. And so to us, in our view, the fact that the stock dropped and went up, because it went up, too, over time, does not by itself create an inference that the plan overpaid for those shares of stock in 2015. So your argument, I take it, is that because the immediate drop was to $13 million, and your opponent seems to concede that that's not particularly evidence of anything, that the fact it went up from $13 to $30, then down a little bit to $25, if we cut it off right there, there would be no evidence of a drop in value or a collapse in value. It would be, if anything, an increase in value. I suppose you'd have to factor in how much the debt was paid down or something like that, like building up equity in a house. But then it went down to $9.8. It's just this is only a sign of market volatility. But the fact that it's going up and going down tells you nothing. I suppose if you had a uniform trend line going down, it went $13 to $12 to $8 to $2, maybe you would have to concede, or you probably wouldn't, but you might have to concede that there was some stronger inference that this whole thing was overvalued. But you're saying because it went up, it went down, and who knows what it is in 2020. I apologize. That's where these information and belief allegations really become important because they're devoid of actual factual allegations in this case. Let's talk about the projections. There is no factual allegation in this case that the company prepared financial projections, let alone my client utilized financial projections for purposes of valuing the company. That's not a factual allegation. But you say it's devoid of factual allegations. There certainly is the fact that it was valued at $25 million in 2018, and it was revalued at $9 million. Those are facts, alleged facts. Those are facts. It's devoid of factual allegations. I will concede that the facts that exist are that there were reported values each year. There are no factual allegations that connect those stock values to any inference of imprudent conduct, a lack of an adequate investigation. The allegation is the numbers are a lot less than the $133 million that the plan purchased it. That's the connection. They're less than the purchase price. When you take into account the fact that there's debt financing that the plan took into this. That took it to $13 million three days later. It did. And if you look at almost every ESOP transaction, what the plan is borrowing money. In most cases, 100%, you will see that decline in the equity value. So three days later, the decline was, in your view, totally due to the collateralization? Yes. Okay. But then what explains the further factual allegations of a drop from $25 million to $9 million? To me, it is pure conjecture to attribute that to the conduct of a transaction that occurred four years earlier. Companies' fortunes can go up and go down. The question is, is there a sufficient allegation that there was an injury in fact attributable to the conduct of my client in evaluating this transaction and causing the plan to enter into it? I don't think there is at all. What are the tools available to a member of the plan? I'm just thinking about this information asymmetry, which is part of the reason why it's a pretty thin set of allegations. What are the tools available to a member of a plan to test or validate that the debt that the plan took on to purchase the shares was commensurate with the value of the shares? Just a participant in the plan? Yeah. Well, I mean, there have been cases that have been brought where members of the company's management team who are participants in the plan have access to the financial information, to the underlying valuation. Is that true here? It's not in this case, but it is in other cases. So, in this case, what would be useful? What would be the tools available to them? The valuation at the time of the transaction is typically not available to the underlying participants. That doesn't mean that there aren't numerous cases that get brought regarding an initial transaction where there's actually replete with allegations of impropriety or misconduct, whether it's brought by participants of the plan, as the example I brought, someone on the company's management team, or by the Department of Labor, who's instituted an investigation and is able to get information that way. But just because, in all instances, someone doesn't have insider access to the information should not be reason that you subvert Article III standing purposes or versus statutory purposes. Can I ask you, just to take one minute, because I want to keep you collectively up at about the same time as the appellant, to address the question that we started with with the appellant, which is the question of, do we have two competing threads of case law in our court about whether allegations in a complaint relating to Article III standing are governed by the plausibility standard or by something less? And it seems that we have Ross and Harry versus Total Gas that say there's a lower standard, and then we have Calcano and some of those cases it relies on that say it's a plausibility standard. Would you agree we have these two, or are those cases somehow all reconcilable? I think there is some tension in the case laws that's developed over time. I do think that the standard for Article III standing, with an injury in fact, the factual allegations presented in this complaint under either standard are not satisfied. All right. Thank you very much. Why don't we hear from your colleague, Mr. Kimberly. Thank you. If I may, I'd like to start by addressing, Judge Robinson, your question. There are a number of tools available to plaintiffs interested in bringing this kind of challenge. Tool number one is the Form 5500 itself, which appends audited financials, as did the 5500 forms here. The problem with the 5500 forms in this case is that they tend to disprove the plaintiff's case. This is not a circumstance in which, first of all, this is not a stock drop case at all. This is a case about paying too much at the creation of the ESOP. That matters because if this theory had water, it would be a violation at the time of the creation of the ESOP only. That is when the violation occurs, when too much is paid. So we know three days after the transaction, $200,000, $133 million is the value of the company. $133 million, this is paragraph 55 of the complaint. No, we don't know it's the value. We know that was the purchase price. So I'm sorry, $133 million is the purchase price. We know that it is financed with $133 million in debt. It's 100% financed, paragraph 55 of the complaint. We then have three days later a Form 5500, which has attached to it audited financials, which show that the equity value is in fact $13.5 million. The only way you get there is if the underlying asset, the enterprise value of the company, exceeds the debt by $13.5 million. So that is, there's no other way to understand it. This is three days later, three days later, the plan is up $13.5 million. That's not a stock drop. That's stock appreciation. There's a representation in the brief, so it's not clear about the timing, that it's standard up front in these for the first infusion of money from the company to come into the plan to pay that down. I don't know whether that's standard in the first three days or standard in the first three months. Do we have any reason to infer one way or the other whether? Well, it's alleged here. It's alleged here, Your Honor. It's paragraph five on appendix page 14, which alleges that at the time of the sale, there was a $200,000 pay down of the debt and that over the next six months, before the next 5500 form was filed on December 31st of that year, an additional $2.8 million was paid down. So we know in the first six months, there was $3 million of debt paid down. But we know also that 12 months later, the value, and you heard my friend on the other side say it's about $2 million a year in pay down. This is a straightforward 40-year amortization schedule. It's straightforward arithmetic. So we know it's being paid down at roughly the rate of $2 million a year. 2017, so now we are one and a half years later, the value is $30.8 million. At that point, roughly $7 million has been paid down. Again, all of this is gleaned from the forms 5500 and the complaint. The court doesn't have to go further than that. Do we know if there's been a change, and I'm sorry if I should know this, in who did the evaluation and what the methodology was? We're not dealing with market trades here. So if somebody's doing an analysis year after year and we're seeing variations, a change in methodology could also impact that. Do we know one way or the other? It could, Your Honor. I don't know that off the top of my head myself, and I can tell you that it's not alleged in the complaint, but what I can tell you in addition is, again, these are audited financials. So it's true this is not a public company subject to SEC disclosures, but these form 5500s are government forms required by the Department of Labor in its implementation of ERISA, and these are public documents certified accurate by accountants. I would note also that ERISA Section 104B allows participants to request copies of trust documents from plan administrators, and in addition to obtain audited annual reports. So that's another tool available to folks who find themselves in the plaintiff's position in this case. If they're interested in actually doing some homework to figure out whether or not the plan overpaid, there are those tools available. I would note also, Judge Newman, coming back to your question about the drop in 2019, again, my friend on the other side has disavowed that this is a stock drop case. He has alleged this case strictly as a violation of the Interested Party Prohibited Transaction provision of ERISA, and if that violation happened, it happened on April 27, 2015. I'm sure it happened then, but I thought he was trying to show us that the evidence that it was too much in 2015 is the drop later. Well, I think he has to say that because he concedes on page 19 of his reply brief that the April 30th valuation is attributable to the 100 percent financing, which again, just taken logically, means that the value of the underlying asset was greater than what the plan paid for it. So you would have to assume that four years later, so all along the plan value is actually going up. The enterprise value of the asset underlying the plan is going up. Four years later, it goes down a bit, and we're to take that as evidence that in 2015, four years earlier, there was an overpayment. So I think your position really is he pled himself out of court by showing the $30 million re-evaluation in 2017. That's exactly right, Your Honor, and that's exactly the phrase that I was going to use and why I think it's an answer to Judge Nardini. Your question is about the standard. This is not a case that turns on plausibility versus colorable allegations, and I'm happy to explain my own view about that. This is a case where the plaintiff has just pled himself out of court. If he had just stopped at the purchase price and said they paid $133 million and that's way too high or that's unreasonably too high, is that a colorable allegation? I don't think so, Your Honor, because that's just a naked statement of essentially an element of the claim. So you've got to do something more than that, even under a colorable standard. You have to provide some further factual enhancement beyond just a statement of the legal conclusion necessary to support the point that you're making. And I would note about all of this, Iqbal Twombly is an interpretation of Rule 8. It's not an interpretation of Rule 12b-6, let alone 12b-1. If Rule 8 is understood to apply to allegations concerning standing, then the Iqbal Twombly plausibility standard has to apply. Although the question is whether we've already said it doesn't, and we may be wrong. In cases like Ross, total gas, if you take those as our first pronouncement on whether Iqbal applies to standing allegations, you might very well be right that we were erroneous when we said that. But if there are two competing lines of case law in our court, we're bound by the earlier one, right? You would be bound by the earlier one, Your Honor. But I would say also it's not clear to me that they're actually distinct. And I think a fair reading of the cases in the intervening time, maybe the best way to read it and reconcile them is just to say there really is no daylight between the standards. But in all events, I would say this is not a case that really presents that question because it fails either way. Again, not only because there's a failure to plead enough, but Judge Newman, to the question that you posed, because the plaintiffs here have actually just affirmatively pled themselves out of court by putting documents before the court referenced in their complaint that show, in fact, that the plan got a good deal, that the value of the asset was for three years substantially higher than what the plan paid for it. And that is not the stuff of a 406 violation. Can you help me? I'm not familiar with these 5,500 filings. I'm looking at one here, and I just want to make sure I understand what each of the line items does and doesn't reflect. Certainly. Right? So the first, the line 1D, is employer securities. That number is the value of the securities as shares in the company without regard to indebtedness that the plan has acquired to buy them? No, it is actually the equity value of the securities. So that is the statement of the value of the plan's assets net of debt. Okay. So if that's net of debt, then what's throwing me is the next line, you go down to liabilities, and there's a line item for liabilities, and then for net assets, you subtract off the liabilities. And I'm trying to figure out whether you're then subtracting off the liabilities twice. You are. It's a very confusing way to handle the form, and I've talked with my friends in my firm who deal with this sort of filing all the time. I'm not an accountant, and I'm not sure I understand why it's done that way, but I am told that that is how it's done. And really what you need to do to understand all of this is to look at the attached audited financials to the actually filed form, all of which lay this out in very clear terms. Now, they haven't actually been brought into this case. My friends on the other side can explain their strategy for not putting them before the court. I leave that to them. But they are referenced in the complaint. That is true. So therefore, to the extent that they're publicly filed and we can find them on our own, they're fairly referenced and can appropriately be considered by us on this motion to dismiss, right? I would say so, and I think, of course, you've got to look at those filings also through the lens of what's been argued. And, again, I would point the court to page 19 of the reply brief before this court, which acknowledges that the 2013 valuation, quote, reflected the transaction debt. There's no question that that. I don't follow your answer to Judge Robertson. Did you say the debt is subtracted twice? There are lines on the form that suggest that it is subtracted twice, that it is. Well, never mind what they suggest. What's actually so? Is it subtracted twice? Not on the actual value, no, Your Honor. It can't be, right? Otherwise it would be minus $133 million. That's right. The plan participants have 13. So in that first one, $13.25 million in value is the value that the plan has in the assets net of the financing. So it was subtracted once. On that line, yes. And then went up to 13, showing it's 13 more than zero. Exactly, that the actual value was $133 million plus $13.25 million. How was the actual value, and you lost me again. Maybe it's my fault. How was the actual value, 133, if it was fully collateralized and came with $133 million of debt? So you've got the enterprise value of the company. That's what it's just worth taking on its own. Let's say it was the price paid, that the enterprise value is $133 million. You've got $133 million in debt, right? So you put those two things together and you'd say the equity value is zero. The enterprise value is canceled out by the debt. If you put those two things together and you get a positive number, it's because the enterprise value of the company is greater than the debt. That's the 13. That's the 13.25 million. Now we know that the $133 million purchase price was financed with $133 million in debt. So if you've got 13.25 million in positive equity value, it's an indication that the asset is in fact worth more than the debt by 13.25 million dollars. So what's the minus 119,980, or 119,980,000 in net assets? That's the line that's throwing me, because that's where that next subtraction happens, right? It subtracts the total liabilities from the total assets, which have already taken into account those liabilities. Right. And then it gives you this other number. That's what I'm trying to understand. And again, unfortunately, just not being an accountant, I don't fully understand why it's done that way. I've been told by the lawyers at my firm who do this sort of thing that the way that I am describing the 13.25 on the first line is as we have described it here. And again, as my friends on the other side concede, the reply brief is the correct way to look at it. Thank you. Thank you. Jenny, you've reserved two minutes for rebuttal. So if you have any last couple of points. Thank you, Your Honor. There's a lot to unpack there. I'll try to keep it short, though. I'll do my best. The Form 5500s don't contain detailed financial information about the company, Theranco. Do you concede that the forms were referenced in the complaint and we could use them in evaluating the case report? Yes, Your Honor. And does that include the financial statements that are apparently appended to them, which I haven't seen? Sure. Yes, Your Honor. Thank you. But as I said, they don't get into the details of the company. And furthermore, these would have been later valuations. Even the first valuation would have taken place months after the ESOP transaction and looked back at the end of the plan year. And the end of the plan year was the last day of April 2015. What about your basic point that on the date of purchase, if they were fully collateralized, there was no value to a purchaser. But three days later, according to your complaint, they were worth $13 million. He says that has to be real equity. Your Honor, in every ESOP case, there's a positive value immediately after the ESOP transaction. The company will put money into the plan. I've never seen a case when there's a zero value or a negative value. But I thought they said they didn't put anything into the plan. I thought they only put $200,000 into the plan right away. Within 2015, right. They put $200,000. So that can't explain a $13 million swing. I could see that if you had evidence that they had put in $15 million, you'd say, well, sure, that meant that they started out below zero. But if they only put $200,000 in in the initial period, that doesn't explain why it didn't have an initial value of whatever, just shy of $13 million or just over $13 million, right? Your Honor, these valuations come from the same trustees that we're suing in these cases. Right, but I'm just trying to analyze your point, which, hey, wait a minute, you say the company put money into this right afterwards. But my understanding of the facts that we're all talking about is that the amount of money put in by the company was only $200,000 and that that could not have, as you suggest, explained the $13 million in equity. Am I stating that properly or is that correct or incorrect, what I've just said? I'm not sure how to answer that, Your Honor. We never relied on the initial stock drop as evidence that. Okay, then let me put it to you this way. We have talked about the numbers going up and down, right, from $13 million to, I can't remember. But they go up, they go down. And then it seems that because you were in, I think it was 2019, saying, well, now they're only worth about $9.8 million. I suppose your attitude is, you know, it went from $13 and fine, it may have had a couple peaks, but now it's sort of showing its true colors as really being subpar. What if then the 2020, let's say your complaint had alleged this, it wasn't there. In 2020, the equity was at $30 million again. Would that defeat your allegation of injury in fact? No, Your Honor. Why not? A lot had happened. For one thing, these post-transaction valuations, you have to take them with a grain of salt. Right. So then why should we infer anything? I mean, if you tell us, look, you can't tell anything from these valuations. If the numbers are good for the appellee, you can't trust them. Well, why should we trust them for you then? We're not asking you to trust the exact numbers. What we're saying is. Well, no, I'm not saying rough numbers. I'm talking about the ups as opposed to downs. And it seems to me you're suggesting that because it went down, we don't need to know whether it's 9.8 or 9 or 8 or 10, but it went down. Because you need to show it goes down to show injury, right? No. If this thing went up to $100 million. We do not. If it went up to $100 million, would you have injury in fact? Your Honor, we're seeing post-transaction valuations being inflated by that much. In this case? Have you alleged that they've gone up? Are you alleged? I guess I'm not understanding what you're saying. Are you saying that if you're saying you see other cases where other companies. Yeah, they have higher valuations, but those are made up numbers. They're inflated. That seems like an argument. You can't believe any of these plan 5500 filings. You know, they're all worthless. But if that's your argument to us, that these things are just not reliable, it seems to me that's your entire allegation of injury in fact is, hey, look at the 5500s. It's not, and if I could, I'd give the reasons. First, inferences need to be drawn in favor of the plaintiff. In this case, they haven't been. They've been drawn against the plaintiff. Platt versus Argent Trust Company dealt with these same issues recently in the Northern District of Illinois. And its analysis was solid on why these post-transaction valuations are not entirely accurate. And one of the reasons was what I got into earlier, the fact that money is being pumped into these plans. That's also- You're saying not entirely accurate. And we try to understand or in fact agree with you that whether it's, where is it, 25.2 or 25.3 doesn't matter. So we get your point that they're not entirely accurate. But I at least, I think others may have thought, they're in your complaint in order to show us that they are a lot less than 133 million. They're in our complaint to show that, to bolster the information and belief allegation, that company projections were not reliable. And that the trustee- Again, you say not reliable. Does that mean they may be off by one or two percent? Or they are so unreliable that they should not affect our decision at all? There's no denying the fact that the company has collapsed. Okay? The company stock right now in the last form 5500 is valued at less than half a million dollars. Right now, away from the purchase. Purchases- You're talking about something outside the complaint now, right? You're talking about the company now in 2022? We're talking about the last, the most recent form 5500. Well, that's seven years after the purchase. We're talking about the 2019 and 2020 form 5500s. Well, wait, is 2020 in the complaint? 2020 is not. Okay, so I don't think you should be telling us what's not in the record. I mean, if we want to just, you know, send this thing back and replete it and have a whole, you know, let's just see where the world is now. But we're reviewing the district court's decision, right? So let's not inject facts that are not in the record. Your Honor, we mentioned it in our briefing to this court. Okay, your briefing to our court is not the record. When we say the record, we mean the record before the district court, right? Well, okay. The 2020 form 5500 is consistent with 2019. You may have said, maybe I misheard you a few minutes ago. The numbers in your complaint don't matter for purposes of testing the sufficiency of the complaint. Is that right? They do matter in that they show that there's no dispute that the company share value has collapsed. And that is relevant to our allegation. I don't see how you can say it collapsed if it went up from zero to 13 million. Your Honor, in every case there's going to be some positive value. There may be, but you pleaded it went up, it was 13, and then later it was 25. Yes. That's not just some value, that's money, right? Your Honor, when these ESOP stock valuations are done, there are projections going forward showing growth in the company. And that's not what happened here. That's their projection. You're the one who came in with a 25 million figure. That's what was reported. Right. Your Honor. So are we supposed to pay attention to it or not? I mean, either we do or we don't. I want to know your view. The exact number. No, I understand not exact. So whether it's 25.2 or .3, but do we say it's around 25 million? Your Honor, the overall drop is relevant. And it's been found relevant in cases like Allen versus Great Bank. Tell me the high and the low so I understand the drop. We don't know the exact value. No, you come back to exact again. Tell me the approximate high and the approximate low. Currently. No, not currently. That's not relevant at all. Okay, and the last one that was reported before we filed a complaint. From the purchase price to a relevant date. The purchase price, I believe, was about $133 million. And immediately collateralized to zero. Right? Approximately, yes. Okay, so when is the next valuation that matters? There was a valuation at the end of the plan year. As reported in our complaint. Is that the? That's the April 30th. Yes, Your Honor. Okay, so now you're at the $13 million. Do we pay attention to that one? As a ballpark number? Not as a ballpark number. No, it doesn't count at all? It's in your complaint. You're the one telling us it matters. You pled it. Your Honor, as I said, we were relying more on the post on the letter. You're entitled to rely or not rely on whatever you want. But you come to court and tell a district court, look at that $13 million figure. The district court's entitled to say, well, it must be in here for some reason. Your Honor, it matters. But what matters is the inference needs to be made in favor of the plaintiff. The inference here is that. That it should have been even higher? Is that the inference? The inference is that the trustee overpaid based on projections that the company would grow. And the company did not grow. The company wanted to decline. And, you know, as for information and belief allegations, those are allowable under ARISTA records. We're allowed to do that. In cases like this where the relevant diligence information. An allegation somewhere in this complaint that says our claim of overpayment is because they projected growth and growth didn't happen. We'll find that in the complaint? Yes, Your Honor. We have that. 63 and 67, I believe. The financial projections were unreasonably optimistic. That's paragraph 63. Correct. I don't think we've kept you up long enough. I'll just whether the other judges have any further questions. Otherwise, we've kept you all far beyond a red light. We appreciate argument on both sides and we will take the case under advisement. Thank you all very much. Your Honor, can I make one more point? No, I think we've had enough, though. Thank you very much. We do appreciate it. Again, we kept you up quite long. Thank you.